Robert S. CALVERT, Comptroller of
Public Accounts, Appellant,

v.

MARATHON OIL COMPANY, Appellee.

No. 11305.

Court of Civil Appeals of Texas.

Austin.

March 10, 1965.

Rehearing Denied March 31, 1965.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst. Atty. Gen., Stanton Stone, Executive Asst. Atty. Gen., H. Grady Chandler and W. E. Allen, Asst. Attys. Gen., Austin, for appellant; Don Bishop, Charles Prock, Austin, Office of the Comptroller of Public Accounts of the State of Texas, of counsel.

Clayton L. Orn, P. D. Ritter, Findlay, Ohio, J. O. Terrell Couch, Houston, Graves, Dougherty, Gee & Hearon, Austin, for appellee.

HUGHES, Justice.

This is a summary judgment case in which all facts were stipulated.

Marathon Oil Company, appellee, filed suit against Robert S. Calvert, Comptroller of Public Accounts of the State of Texas, asking for a declaratory judgment regarding its liability, vel non, or extent of liability, for taxes under the provisions of the 1961 Texas Limited Sales, Excise and Use Tax Act[1] by reason of the following described transaction and other relevant facts.

On December 28, 1961, appellee[2] entered into a contract with Plymouth Oil Company, a foreign corporation, under which appellee agreed to buy substantially all of its assets, except an oil payment which Plymouth simultaneously agreed to sell to a third party. This contract and both sales were consummated on April 3, 1962.

The property purchased by appellee from Plymouth consisted principally of oil and gas leases and other real property. The only personal property included in the sale was that which was held by Plymouth for use or disposition incidental to the conduct of the business of finding, producing, processing and refining oil and gas and wholesale marketing of oil, gas and petroleum products.

Some of the property purchased by Marathon was to be resold, but not at retail.

Immediately following consummation of these sales, Plymouth wound up its affairs and withdrew from the State of Texas.

Plymouth applied for and received a Sales Tax Permit under the provisions of the Tax Act, and it held such permit until the consummation of these sales on April 3, 1962. Texas sales of tangible personal property by Plymouth in the amount of $3,507.71 were included in Plymouth's reports to the Comptroller for the period September 1, 1961 through April 3, 1962, and the sales taxes due thereon were paid.

It was stipulated that Mr. Frank W. MacLean, Controller of Plymouth for six years prior to June 1962, would testify in conformity with his affidavit which is in the record. The affidavit of Mr. MacLean is not controverted and we accept it as accurate.

We quote the following from such affidavit:

"During the entire time that I was Controller of Plymouth Oil Company, as stated above, up to and including the date of consummation of sale of substantially all of the assets of Plymouth to Marathon Oil Company (then the Ohio Oil Company) on April 3, 1962, the only business Plymouth engaged in was the business of finding, producing, processing and refining of oil and gas, and wholesale marketing of oil, gas and petroleum products. Plymouth owned no personal property, except such personal property as was owned or held for use or disposition incidental to the conduct of that business. At no time during that period did Plymouth engage in any retail operation or in any way hold itself

1. Acts 1961, 57th Leg. 1st C.S., p. 71, Ch. 24, Art. 1, Sec. 1, codified as Ch. 20, Title 122A, Taxation-General, V.A.C.S.

2. Then known as the Ohio Oil Company.

out as a seller of personal property to the general consumer trade.

"3. I have examined the accounting records of Plymouth and those records disclose that during the period from September 1, 1961, through March 31, 1962, Plymouth had gross sales income of $43,765,101.21 which was derived almost entirely from sales of oil, gas and petroleum products to wholesalers, jobbers or other oil companies for resale or for further processing and resale. Of the total gross sales income of $43,765,101.21 only $3,507.71 of the sales in the State of Texas was from sales other than sales for resale or sales otherwise exempt from the Texas Limited Sales and Use Tax.

"4. Except for the very rare sales to outsiders listed below, these Texas sales in the amount of $3,507.71 represented sales by Plymouth to its employees at its Texas City Refinery and consisted of sales of grease, motor oil, transmission fluid and miscellaneous items of scrap. The sales of grease, motor oil and transmission fluid to employees were made at wholesale prices and the sales of miscellaneous scrap were made at junk value. All sales to employees were made as an accomodation to them and to foster employee good will. The employee sales were not made for profit as a part of Plymouth's business because the expenses incident to such small sales at wholesale prices ordinarily offset any profit on the sale. Except for the following five sales, all of the foregoing sales were made to Plymouth's refinery employees (or in one instance to the son of a refinery employee):

(Here are listed five sales to named purchasers totalling $39.95)

Between April 1, 1962, and the sale by Plymouth on April 3, 1962, of its business assets, Plymouth made no further accomodation sales to its employees or other such incidental sales to outsiders.

"5. On the basis of Plymouth's records, which I have examined, and on the basis of my experience as an accountant and auditor and as Controller of Plymouth, I know that Plymouth was not engaged in the business of making sales directly to consumers.

"6. In accordance with its previously adopted plan of liquidation, Plymouth on April 3, 1962, sold *en masse* to Marathon Oil Company substantially all of its assets, except for a production payment which Plymouth sold to a third party. While the assets sold included some personal property, there was no separate sale of any personal property or real property by Plymouth to Marathon Oil Company. All of the assets sold to Marathon Oil Company were sold to it in one single transaction."

It is stipulated that in the event final judgment herein is adverse to appellee that there are other possible exemptions and issues with respect to the amount of taxes due and that such matters are "outside the scope of this action and are not now presented for determination."

Appellee has contracted that it will pay all sales taxes imposed on Plymouth by the sale to appellee on April 3, 1962.

Appellee moved for a summary declaratory judgment declaring:

"(a) The liquidation sale by Plymouth to Plaintiff insofar as it included incidentally any tangible personal property located within the State of Texas was not a 'retail sale' or a 'sale at retail' within the meaning of House Bill 20, Acts 1961, 57th Legislature, First Called Session, Chapter 24 and is,

therefore, not subject to any sales tax;

"(b) In the alternative if said liquidation sale was a retail sale or a sale at retail within the meaning of said Act, said sale is nevertheless exempt from taxation as an 'occasional' sale within the meaning of the same Act, * * *"

Appellant also moved for a summary declaratory judgment to the effect that the sale by Plymouth of all its tangible personal properties located in Texas was a taxable "retail sale" or "sale at retail" within the Act and that such sale was subject to the 2% limited sales tax imposed by the Act.

■ The motion of appellee was granted, and the motion of appellant denied. The trial court did not indicate in its judgment whether it declared the law to be as stated in (a) or (b) in appellee's motion, supra. It is our opinion that the law is as stated in (a) in such motion, and we do not determine the validity of the declaration of law in (b) in such motion.

The sale which appellant seeks to tax is a sale not made in the regular course of business of Plymouth. It was a sale by which, together with a contemporaneous sale, Plymouth was liquidated and ceased to do business. Plymouth was not in the business of making sales of this character.

We do not understand appellant to contend that the sale to appellee was in the regular course of business in which Plymouth was engaged. Rather, it is the position of appellant that the sale by Plymouth to Marathon was not for the purpose of resale by Marathon in the regular course of its business, and that, therefore, under the provisions of the Act it was a retail sale and subject to the tax imposed by it.

Sec. (I) of Art. 20.09 in paragraph (1) provides:

"(I) Payment on Termination of Business and Successor's Liability.

"(1) Withholding by Purchaser. If any vendor liable for any amount under this Chapter sells out his business or stock of goods or quits the business, his successor or assigns shall withhold sufficient of the purchase price to cover such amount until the former owner produces a receipt from the Comptroller showing that it has been paid or a certificate stating that no amount is due."

This section, to our minds, evidences unmistakably the intention of the Legislature not to tax a sale whereby a retailer "sells out his business or stock of goods or quits the business" because if it had intended otherwise it would not have required the purchaser to withhold only the amount of taxes under the Act for which the vendor was then liable but it would have required the purchaser to withhold from the purchase price the amount of taxes due as a result of the sale itself.

Unless this clearly indicated legislative intention is refuted by other terms of the Act, we hold that it is controlling.

■ Art. 20.02 provides:

"There is hereby imposed upon each separate sale at retail of tangible personal property made within this State a limited sales tax at the rate of two per cent (2%) of the sale price of each item or article of tangible personal property when sold at retail in this State."

Art. 20.01, Sec. (1) paragraph (I) provides:

"Retail Sale or Sale at Retail. 'Retail Sale' or 'Sale at Retail' means:

"(1) A sale for any purpose other than for resale in the regular course of business of tangible personal property."

This latter provision is the subject of profound discussion by the parties. Appellant contends that the grammatical construction of it "leads only to the interpretation that the phrase 'in the regular course of business' refers to the business of the *purchaser* and not to the business of the seller."

Appellee, just as vigorously and at some length, defends what it conceives to be the proper grammatical construction of this provision which is that the phrase "in the regular course of business" modifies the word "sale," not the word "resale."

We will not delve into these profundities because we will, with or without grammatical blessing, seek to ascertain the legislative intent.

This provision is illucid. We lean to the interpretation that it means that a sale at retail is a sale in the regular course of business of the seller which is not made for the purpose of resale.

The word "Retailer" is defined in Art. 20.01(J)(1)(a) and (b) as follows:

"(J) Retailer.

"(1) 'Retailer' includes:

"(a) Every seller engaged in the business of making sales of tangible personal property for storage, use or other consumption or in the business of making sales at auction of tangible personal property owned by the person or others for storage, use or other consumption.

"(b) Every person making more than two retail sales of tangible personal property during any twelve-month period, including sales made in the capacity of assignee for the benefit of creditors, or receiver or trustee in bankruptcy."

Art. 20.01 Sec. (M) defines "Seller" as follows:

" 'Seller' includes every person engaged in the business of selling, leasing or renting tangible personal property of a kind, the receipts from the retail sale, lease or rental of which are required to be included in the measure of the limited sales tax."

These provisions clearly indicate the general requirement that a "Retailer" or Seller" under the Act must be "engaged in the business" of making sales of or leasing etc. tangible personal property. Where there are exceptions to this general requirement, they are plainly stated.

These provisions do not employ the words "in the regular course of business" but we are unable to distinguish this phrase from the language used in the two provisions under discussion. If a person is engaged in the business of selling or making sales of tangible personal property, groceries for example, such sales would be in the regular course of his business. Appellee here was not engaged in the business of selling substantially all of its assets in a single transaction, and such sale was not in the regular course of its business.

These terms are used interchangeably in Sec. (G), Art. 20.02. Preceding Sec. (F) provides, in part, that the burden of proving that a sale of tangible personal property is not a sale at retail shall be upon the seller unless he takes a Resale Certificate from the purchaser. Sec. (G) reads:

"(G) Effect of Resale Certificate. The resale certificate relieves the seller from the burden of proof only if taken in good faith from a person who is engaged in the business of selling, leasing or renting tangible personal property. A resale certificate may be given by a purchaser, who at the time of purchasing the tangible personal property, intends to sell, lease or rent it in the regular course of business or is unable to ascertain at the time of purchase whether the tangible personal

property will be resold, leased or rented or will be used for some other purposes."

It is obvious that if a seller is relieved of liability for the tax when he in good faith takes a Resale Certificate from a person "engaged in the business" of selling etc. tangible personal property and that only a person who intends to sell etc. the tangible personal property so purchased "in the regular course of business" then the terms are synonymous, otherwise a seller would be authorized to take a Resale Certificate from one who was not authorized to give it.

We also observe that in following Sec. (H) prescribing the form and contents of a Resale Certificate it is provided (1)(c) "Indicate the general character of the tangible personal property sold, leased or rented by the purchaser in the regular course of business."

Following Sec. (I) also provides that if a purchaser giving a Resale Certificate makes any use of the property other than holding it for sale etc. "in the regular course of business," then the tax shall be paid by him as provided.

These sections clearly indicate that the character of the sales made or other business done by a seller is of paramount importance in determining the taxableness of the transaction and that a sale to be taxable must, with clearly defined exceptions, be made in the regular course of business of the seller in order to be taxable.

Sec. (I) demonstrates that a purchaser becomes and is treated as a seller when the property purchased by him is held for sale etc. in the "regular course of business," and as long as the property is so held or so sold the purchaser who gives a Resale Certificate is never liable for payment (as distinguished from collection) [3] of the tax.

Sec. (J) Art. 20.03 augments this conclusion by its provisions that a person who gives a Resale Certificate knowing that the property is purchased for use rather than for resale in the "regular course of business" is guilty of a misdemeanor. Sales in the regular course of business are, of course, made by a "seller," although the seller may have acquired, and usually does acquire, the property sold by purchase in which transaction he was a purchaser.

■ Receipts are defined in Sec. (D) (1) of Art. 20.01. In Sec. (D)(2) of such Article there are listed several items which are not receipts. In 1963 the Legislature amended this latter section of such Article so as to exclude as receipts the following as occasional sales:

"The sale of the entire operating assets of a business or of a separate division, branch or identifiable segment of a business. For the purpose of this subsection a 'separate division, branch or identifiable segment' shall be deemed to exist if prior to its sale the income and expenses attributable to such 'sepparate division, branch or identifiable segment' could be separately ascertained from the books of account or record. The purpose of this subsection is to clarify existing law and merely expresses the original intention of the Legislature." Art. 20.01, Sec. (F)(2).

While this provision was not in effect when the transaction involved in this suit occurred and is not controlling, we have, nevertheless, considered it as highly persuasive in ascertaining the legislative intent contained in the statutes before the Court. The intent ascribed by us to these statutes coincide with the intent which the Legislature has stated was its original intention.

■ In reaching our decision herein we have also followed the rule expressed in

3. Sec. (A), Art. 20.02 provides that taxes imposed by the Act shall be collected by the retailer from the consumer.

Calvert v. Fort Worth National Bank, 163 Tex. 405, 356 S.W.2d 918, that, "We begin with the premise that the statute imposes a special tax and must be strictly construed against the government. Where the meaning of such a law is doubtful, the doubt should be resolved in favor of the taxpayer." See also Calvert v. Audio Center Inc., 346 S.W.2d 420, Austin C.C.A., writ ref., n.r.e. and authorities therein cited.

We have found the meaning of the involved statutes on the question presented doubtful. We have resolved that doubt in favor of the taxpayer, and declare the law to be as herein stated. We, therefore, affirm the judgment of the trial court.

Affirmed.

## ON MOTION FOR REHEARING

 Appellant is critical of our opinion because we utilized the 1963 addition to Art. 20.01, being Sec. (F)(2), as persuasive authority but did not similarly use the 1963 amendment of Art. 20.01 (I)(1), which now reads, "Retail Sale or Sale at Retail. 'Retail Sale' or 'Sale at Retail' means: (1) Any sale of tangible personal property."

Sec. (F)(2) of the 1963 Act if it had been in effect when this case arose would have by explicit language exempted appellee from the tax here sought. It stated that this was the original legislative intention. This is why we relied on such Article as persuasive. Sec. (I) (1) as amended in 1963 does not contain similar language as to Legislative intent. While its language standing alone is explicit, it will undoubtedly be construed with other provisions of the Act when the occasion arises. Its language is broad enough to include all sales, both retail and wholesale as those terms are commonly understood and thus completely change the scheme of the tax as previously considered. These are the

reasons we did not use this amendment as persuasive of a contrary decision.

The motion is overruled.

Motion Overruled.